Everybody's getting situated. Case number 141119, Syed Sami v. Detroit Medical Center, oral argument not to exceed 15 minutes for the defendant. 15 minutes will be shared by the defendants, and there's a call for the appellants. Good morning, your honors. May it please the court, my name is Mark McCulloch. I'm here on behalf of Dr. Sami, the appellant. The case here is on a summary judgment. Rebuttal time. Rebuttal time. Judge Gibbons, if it please, I'll reserve three. I apologize to the court. Oh no, it's fine. As an initial matter, we did acknowledge in our reply, and I wish to acknowledge again for the record, there was a suggestion by the defendants that our statement of facts, statement of the case, was incomplete. It was not an intentional matter. We do apologize to the court. We apologize to the defendants. Dr. Sami was and is a good medical professional. He had a very difficult time during his residency program, where he was subjected to some hateful, extraordinarily insensitive comments from both the senior resident, as well as the director of the program, Dr. Markle. These comments cannot be ignored. They cannot be excused. They cannot be left to some legal maneuver to excuse them. Dr. Sami is from Pakistan. He comes to this country, he attends Wayne State Medical School, graduates from there, approaches his residency program, and the senior resident begins to refer to him as the Taliban. The senior resident says, in one instance detailed in the briefs, Better watch out, because Dr. Sami might make us look like this when examining a bomb blast victim. Well, I mean, and we have read the briefs and the descriptions of those comments, and I mean, nobody's going to dispute that they're totally inappropriate, and we accept at this stage of the case that they actually happened. But, obviously, there were some other events related to your client's conduct and ability to perform the job well that caused his termination, and I guess that's what we have to grapple with. Of course, Judge Gethel, I agree with that. Dr. Sami had difficulties. There were problems and incidents that were related to his medical teaching. The residency program is designed to be a teaching tool. But the teacher, when the student comes to the teacher and says, Tell me how I can improve, and the teacher says, Well, why don't you start by stop watching Middle Eastern porn? That's not an appropriate relationship. That's not an appropriate teaching responsibility. Does Dr. Sami dispute? Well, he's not, you know, you're going to have to get from there to some connection between that and the ultimate termination, and, you know, it's a pretty long way. I would respectfully, Your Honor, suggest that it's not that far. And here's how it, the common denominator, the common piece that connects all of this together, both from the beginning where Dr. Sami has complained on at least three occasions to the head of the program about the discrimination that he's facing, through to the use of a complaint from the senior resident. The defendant suggests that the senior resident is just another fellow resident and doesn't mean anything, but the senior resident testified, I'm a senior resident. Junior residents are required to listen to me. It's a supervisory position. When you take a look at the timeline that carries Dr. Sami first through his first year into his second year, his second year into an extended second year, when you examine the events that take place during that time, Dr. Markell is the cog. He is the cog in the machine. He is the cog that has already shown an extraordinarily insensitive bias against Dr. Sami, and yet is the one who is responsible, who is in charge. The incidents leading to his, first the remediation, but ultimately to a probationary decision that Dr. Markell and Dr. Lemos both were dissatisfied with, when you look at the timeline of where this goes from starting in the second year, the first year ends with a renewal. It ends with a renewal. It ends with first year. There were some things, meets expectations. Dr. Sami is permitted to have, is engaged to a second year of this five-year residency program. It's during this second year when these issues arise with Dr. Markell, who then takes those issues and directs the Director of Security at the Providence Hospital to issue this ban, because Dr. Sami is aggressive and violent and likely to go off if we tell him that we're about to fire him, even though he's not being fired. I just want to ask you, your reply brief, just something that confused me a little bit, as you're getting into Dr. Markell and the Providence Hospital and your discussion here. So in the reply brief, there's a suggestion that it's sort of an ankle bone connected to the knee bone, that Dr. Markell is getting Dr. Sami in trouble at Providence, so then he can use that as an excuse to terminate him from the residency program. Is that an accurate statement? That's correct, yes, Your Honor. Okay, so on page 8 of your reply brief, you refer to a phone call that Dr. Markell made to Mr. Campbell, and then you refer coming back, Mr. Campbell sent an e-mail, and the quote is on per our conversation. The suggestion, I think, in your brief is that there's more than one conversation going on there, but do you have any evidence that there's anything more than that December 8th phone call? I mean, it struck me as I read it that maybe per our conversation was the very same phone call, and therefore Dr. Markell was not underplaying his involvement because there was only one phone call. Is there some evidence? I was confused by that. I'm just trying to figure out if there's something more to that. I would suggest that there is more to that. And what is it? That Dr. Markell's decision or direction to the director at Providence, to Campbell at Providence, follows his attempts to have Dr. Sammey terminated, and those attempts are rebuffed. Dr. Sammey is not terminated at that time. Dr. Markell is intent on having Dr. Sammey removed and didn't like the idea that the decision was made that he shouldn't be terminated. Dr. Markell says, look, I'm the chairman of this program. I'll make it happen. You know, tell Dr. Sammey, look, you better straighten up and fly right or I'll have you fired because I have the power to do that, and that suggests when you couple it with the comments that Dr. Markell has made, the influence that he has brought to bear suggests that when the director of security then shows up and starts posting with a mugshot of Dr. Sammey being aggressive and violent without any justification to do so, the... But all that was the result of a single phone call from Dr. Markell. That's all I'm trying to pin down is was there more. Is there some evidence of further pressure, I guess, that Dr. Markell is applying at Providence, or is it just a single phone call and from that follows the mugshot and everything else? That's what was confusing me in your brief. That's all. I think that the record would show that it may have been a single phone call, but it was the result of additional communication and steps and coordination. So you can't cite anything specific with Providence Hospital? Not directly from the record, no. But I can say that a reasonable inference can be drawn and should be drawn in Dr. Sammey's favor, at least to the extent that there exists a question of fact, specifically the question of whether or not Dr. Sammey was aggressive and violent and therefore needed to be removed from Providence. There is certainly a question of fact from the record that's before the court. Certainly there is a declaration that is attached in support from Nurse Murabanian. This is a significant incident that takes up a considerable amount of time in the argument. This declaration, filed a week before the summary judgment was filed, was signed before there, suggests and uses the threatening language, where her memorandum, written nearly contemporaneous to the event, at the request of Dr. Markle, makes no suggestion of that. It makes no suggestion of any, I didn't feel threatened, I didn't have to call security to walk me to the car, I didn't feel threatened. It's a material question, it's a material fact, upon which the defendants rely. And the fact that the declaration that is submitted in support contradicts, or certainly questions, the contemporaneous memorandum, suggests that it should be left to the jury to determine whether or not the incident was accurately portrayed. It's one thing if the incident... I apologize. Thank you, Your Honors. Now, are you all both arguing? We're going to both argue. We'll split the time. Okay. Your Honors, it's John Cashin appearing on behalf of the Appalese Detroit Medical Center. Evenly split the time. Evenly split the time would be great. So I represent the Detroit Medical Center and Dr. Lemos, and Mr. Jensen represents Dr. Markle. I need to correct one statement by counsel, and that is Dr. Markle is not the director of the orthopedic residency program. He is at one site. So this is the DMC, has multiple hospitals, but they do this orthopedic residency program in conjunction with Providence, and Dr. Markle is at Providence. So he oversees the program at that particular site, but as I say, it's only one of multiple sites that a resident will work at during the course of the five-year residency program. I don't think there's any question about the first issue raised on appeal by appellant, which is the direct evidence, so I'm not going to spend my time on it. I think it's covered sufficiently in the brief, and it's compelling that the alleged statements do not constitute direct evidence. But I didn't hear, really, counsel talking about the cat's paw argument. That's really the main issue from my vantage point. In his brief, appellant faults Dr. Lawson for relying on pre-staub decisions in his opinion, and he did, and that's, I guess, somewhat unfortunate that he did, because I think you get the same result, and he applied the same really correct test when you look at what evidence there was. And so we know that in Staub, which is a USERA case, right, the U.S. Supreme Court said there's no hard and fast rule that an independent investigation will immunize the employer. If the investigation, however, results in adverse action independent of the biased supervisor's action, then the employer will not be liable. And that's what we have here. And so it's important to understand what the timeline, as counsel refers to, that occurs, because there is very extensive procedures that are followed and allowed to Dr. Sammy to question, provide his own evidence, that sort of thing. And so we start out with the academic remediation, which is not a disciplinary action. He's got three months to correct some performance deficiencies, and he takes the last 30 days, a leave of absence, to take his schizophrenic brother back to Pakistan for treatment. And he lies about it, right? And so the OERC, which is the panel of all the orthopedic surgeons, they view his performance over that last year, and they look at his lies about going to Pakistan, and they recommend termination. The program director is Dr. Lemos. He takes that recommendation to the director of the graduate medical education, that's Dr. Kellogg, who does the first investigation, if you will. And so she takes information submitted by Dr. Sammy, she questions Dr. Sammy, and then she makes her recommendation to an independent committee, which is this graduate medical education committee, which is three doctors that are not involved with the orthopedic program at all. They then have Dr. Sammy is represented by counsel, they get briefed from his attorney, he accompanies Dr. Sammy to the hearing, he's allowed to present any evidence they want, and in their decision, which is, you have it, it's the February 21, 2011 decision, they go through the evidence and they say, look, despite the recommendation of termination, they exercise their independence. They don't terminate him. They say, although there's ample grounds to support termination, we're going to put him on probation. And that's what happens. And if you go through the various reasons that they cite in the opinion, it doesn't have anything to do, it doesn't refer to Dr. Markle, it doesn't refer to this list that Dr. Widorczyk, as the resident, circulated and got other residents to sign a year previous, right? It doesn't refer to any of that. Instead it refers to performance deficiencies and to various events that Dr. Sammy admits, including the never event in which Dr. Sammy marked the wrong hip. So then he goes through probation. He's got six months of probation. And at the end of that probationary period, this committee of the orthopedic surgeons again review his performance record and decide that he has not complied with his probationary terms. They ask the program director, Dr. Lemos, to carry that to, again, the director of the graduate medical education, Kellogg's. He goes through the same procedure again, calling in Sammy, interviewing him, reviewing the documents that he submits, and makes a recommendation to the corrective action committee, the same three independent and neutral doctors, and they review all of it. Now, they're not looking back at, oh, he was banned from Providence Hospital. They're not looking back at, oh, back in January of 2010, there was this list from residents that had issues with him. They looked at his performance during the probationary period, that last six months, and they found multiple deficiencies. Again, this is in the November 10, 2011 report that they generate, including his testimony in front of them where he pulled all this confidential information, which he had been apparently copying and collecting from patients, and they felt that was a HIPAA violation, for example. So we have then their termination decision that's issued then in November of 2011. There is another round of appeal where Dr. Sammy goes to the chief medical officer. Dr. White presents his case to her. She denies it and agrees with the termination decision. This is very much like the Romans case. It's post-Staub in this circuit, and the court there, independent investigation by the Office of Labor Relations in that case. The court said there were four violations of work rules, one of which related to the alleged biased supervisor, but any one of which would have supported the termination decision. This court said the cat's paw viability theory doesn't prevent the termination there, and summary judgment was granted. The same here. Through all of these procedures and this conduct, much of which is admitted, and a great majority of which has nothing to do with Dr. Markle or with resident Dr. Bedorczyk that support the termination decision. That cuts off any proximate causation from the alleged discriminatory, those individuals as discriminatory animus and completely supports the adverse actions that were taken here. I'm running out of time. Are there any questions? Thank you much. Thank you. Good morning. May it please the Court. Larry Jensen on behalf of Defendant Appley, Dr. David Markle. I want to get right to the points that Judge Gibbons and Judge Dowd made, and I think where Dr. Siemey really hangs his head on his case against Dr. Markle here for tortious interference is the Merebanian incident. That's what we call it for whatever reason. That single item over the course of years, in his mind, is the proximate cause of all of his troubles with his orthopedic residency. However, I think the record is clear that in no way establishes that Dr. Siemey can create any type of illegal or wrongful or malicious type of motive here on behalf of Dr. Markle. And there's really three aspects, and you pointed to this earlier, Judge Dowd, in his reply brief, where he tries to create an improper motive here that's just not there. And the first is that after the December 8, 2010 letter that Michael Campbell from Providence wrote, that that was the end hardline involvement from Dr. Markle. Admittedly, after the letter went out, there was no anticipation, expectation, that Dr. Markle would return to Providence Hospital to do a rotation there. He was still in the program. He would still continue under the guidance, under the probation, and all the other aspects of the orthopedic program, but he was not to do the rotation at Providence. So that expectation was there. After that, given the statements, given the demeanor, the unprofessional conduct, asking other employees, asking doctors if they were Jewish, there was great concern about him unknowingly coming on site and potentially being a security risk. So was there a conversation with Dr. Markle and the head of security for Providence? And did the head of security for Providence, William Plass, have a connection with the head of security for the DMC? Yeah. There was that concern. But does that conversation, that one conversation, that there's no record of, by the way, because Dr. Markle didn't remember any specifics of it and the security director was never deposed or offer any evidence in this case. So does that create an unlawful motive? Absolutely not. The other point that counsel made that he attempts to bring into the Meribanean incident as being highlighting an unlawful motive is the fact that there's in the statement that was given by Ms. Meribanean after the incident, she didn't use the word threatening or intimidated or whatever it is that exactly she should have, in Dr. Seamy's mind, included. However, if you look at it, there were two things there. One, there was a conversation between Dr. Markle and Ms. Meribanean. And Dr. Markle's testimony is very clear that he recalls her saying that she felt threatened. He didn't remember all the specifics of it, but he certainly remembered her feeling threatened. So the fact that Ms. Meribanean, in her statement that was given a week or two after the incident, didn't include the word threatening, does that create an improper, unlawful motive on behalf of Dr. Markle? No, it does not. And then the last aspect of the Meribanean incident that Dr. Seamy tries to, again, push into some unlawful motive is the timing of it. The fact that these incidents occurred in the summer of 2010, then ultimately the letter from Providence banning Dr. Seamy from doing any additional orthopedic rotations was issued in December. However, again, that's not the responsibility of Dr. Markle, who's the site director. He's not in charge of the graduate medical education aspect of overall the residents at Providence Hospital. That's not his responsibility. The timing wasn't Dr. Markle's responsibility. And again, it does not create any type of unlawful motive. The other aspect that I wanted to address that was touched on by Judge Gibbons earlier is really the causation part of this, and this being a very extremely long road from the allegations against Dr. Markle that occurred in 2010 all the way to his ultimate termination after being reinstated, going on probation, and ultimately being terminated a year later. As the district court noted, Dr. Seamy has never explained how it is that he was harmed by Dr. Markle after being left in the program for an entire year. It was never explained. It's not explained in the appellate brief. It's not explained in the reply brief. The facts in the record are clear that the termination recommendations, none of them cite the ban at Providence as far as the rotations go as being a basis for his termination from the program. And in fact, once he was banned by Providence, and Mike Campbell, not Dr. Markle, because he doesn't have the authority to do that, but once he was banned, Dr. Seamy continued in the program. And they put him into other rotations that were suitable and gave him that opportunity to continue his orthopedic residency program and be successful. And that can't be laid at the feet of Dr. Markle. That is not his responsibility once Dr. Seamy continues into the program. So, in essence, Dr. Seamy's offered no evidence that the Providence Hospital ban caused his termination, and as the record indicates, his termination was caused ultimately because he failed to meet those objectives that were set forth for him as part of his probationary period. I want to make one other point that I think that the court should recognize, and we spent a considerable amount of time on our brief on this, so I'll just hit it very briefly, but I think it is important for the court to understand that these issues that Dr. Markle was bringing to both OREC as well as the individuals at Providence who were in charge, these issues dealt directly with patient safety and staff safety and concerns. These were not issues involving Dr. Seamy off-site or in some other way being unlawful outside the programmer's duties. These were directly related to what he was there to do. And Dr. Markle, as well as all the other members of OREC, were responsible for his academic progress, and they were also responsible for his professional conduct on-site. And so by putting those issues before OREC, before the GME, that was not only the right thing to do, it was the lawful thing to do. And I think the two cases that we cite, Qatar v. Three Rivers Hospital as well as Ritten v. Lapeer Regional Medical Center, make clear that any time in situations like this, in both cases involved medical facilities, where in one case a CEO sent a letter removing a doctor from that site, summary judgment was affirmed for the defendants because reporting, quote, patient concerns is not wrongful, it's not malicious, it's not illegal. And, in fact, it's the right thing to do, it's the lawful thing to do, and that's what Dr. Markle did. I see that my time is up. Thank you very much. And we would just request that the Court affirm the District Court's opinion. Thank you. Mr. McClellan. Your Honors, may I please the Court? Although where there is no hard and fast rule under the Staub case and its progeny, they say there is no hard and fast rule, that's exactly what the defendants rely on. They rely on an absolute hard and fast rule that because they made an independent investigation, that they're excused from the liability. I would suggest that the additional reasons, the independent reasons, the other reasons that might justify, you have to look at the factual nature of those allegations. The factual nature of those allegations is, the record suggests, that there are factual disputes about, one, whether some of those incidents happened at all, and two, whether or not they were deliberately exaggerated to impact Dr. Sammey's ability to proceed through this residency program. Residency builds one year after the next, and when Dr. Sammey is held and is not able to complete the program in the kind of atmosphere and with the kind of instruction and guidance and support that is to be expected from a residency program, his skills can begin to fall behind that of other residents. In this committee decision on February 21, 2011, would you agree that it's undisputed, I mean, they cite this, but I'm asking, do you agree it's undisputed that your client did mark the wrong hip on one patient? I don't think that's disputed. So that's undisputed? I think that is. What about the incident where he wouldn't wash his hands before working out? I think that's disputed. That is disputed? That's disputed. Okay. What about asking other doctors and staff whether they were Jewish? I don't see how that's relevant to his medical training. Is it disputed? I don't think it's disputed, but I don't think it's relevant to his medical training. Are they allowed to consider anything beyond pure medical training in considering whether his employment should continue with the hospital? Are they allowed to consider external issues? I mean, if he says racist things, hypothetically, I know things were said to him. I know other doctors said things to him, but if he were saying things to other staff, anti-Semitic things, is that something they can consider in determining whether to continue his employment? I suspect there could be if there were complaints made that he was making anti-Semitic or discriminatory comments, but there is no record evidence of that. And, in fact, the record evidence suggests that Dr. Samming went to the director of the program, Dr. Blasier, on three separate occasions. Dr. Blasier said, look, don't worry about it. I'll take care of it. I'll talk to Dr. Markle. Don't worry about it. It's just the first time, it's resident bickering. Okay. The second time, don't worry about it. I'll talk to him. The third time, look, I really don't feel comfortable going over there because I'm being harassed over there. I'm being harassed by the person who's supposed to be in charge of this program. Okay. All right.  Thank you, Your Honor. We appreciate the argument that all of you have given. We'll consider the case carefully.